**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DEL RICCO D. MORRIS, | CASE NO. 1:20-CV-01702-BMB |
|             Petitioner, | DISTRICT JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | |
| WARDEN RONALD ERDOS, | MAGISTRATE JUDGE AMANDA M. KNAPP |
|             Respondent. | **REPORT AND RECOMMENDATION** |

On July 31, 2020, Petitioner Del Ricco Morris ("Petitioner" or "Mr. Morris") filed a petition for writ of habeas corpus under 28 U.S.C. § 2254.  (ECF Doc. 1 ("Petition").)   The Petition was reassigned and automatically referred to the undersigned on October 1, 2021 pursuant to General Order 2021-15.  On December 27, 2022, Mr. Morris filed a Motion for Stay and Abeyance or, in the alternative, dismissal of the unexhausted claims in Grounds Two and Three so he may proceed in this Court on Ground One alone.  (ECF Doc. 12 ("Motion")).  On December 29, 2022, Respondent filed a brief in opposition, opposing the motion to stay the case but not the alternative request to dismiss Grounds Two and Three without prejudice.  (ECF Doc. 13, p. 3.)  The briefing is complete, and this case is now ripe for review.

For the reasons set forth herein, the undersigned recommends that the Court **DENY** Mr. Morris' Motion for Stay and Abeyance, **GRANT** his request to dismiss Grounds Two and Three, and **DISMISS** his § 2254 Petition because Ground One has been procedurally defaulted.

# I.  Factual and Procedural Background

A summary of the factual and procedural background is provided below to give context for this report and recommendation.

## A.  Factual Background

As detailed by the Ohio Court of Appeals:

{¶ 3} In June 2017, Morris and his codefendants, Denzel Carr ("Denzel") and Rai'Shoun Morris ("Rai'Shoun"), were named in a 14-count indictment, charging them each with aggravated robbery in violation of R.C. 2911.01(A)(1), with one-and three-year firearm specifications (Count 1); robbery in violation of R.C. 2911.02(A)(1), with one-and three-year firearm specifications (Count 2); robbery in violation of R.C. 2911.02(A)(2), with one-and three-year firearm specifications (Counts 3-6); robbery in violation of R.C. 2911.02(A)(3), with one-and three-year firearm specifications (Counts 7-10); and kidnapping in violation of R.C. 2905.01(A)(2), with one-and three-year firearm specifications (Counts 11-14). The charges brought against Morris stemmed from allegations that he participated in the armed robbery of a jewelry store located in Richmond Heights, Ohio.

{¶ 4}  In February 2018, Morris pleaded guilty to aggravated robbery and kidnapping, as amended in Counts 1 and 11 of the indictment. The remaining counts were nolled. Prior to the imposition of a sentence, however, Morris filed a motion to withdraw his plea. The trial court granted Morris's motion to withdraw and the matter was scheduled for trial.

{¶ 5} In August 2018, Morris appeared before the court and executed a written waiver of his right to a trial by jury. In open court, Morris orally confirmed that he signed the written waiver, that he understood the rights he was waiving, and that it was his desire to waive a jury trial. The matter then proceeded to a bench trial, where the following evidence was adduced.

{¶ 6} On May 22, 2017, Susan Kozlowski, Steve Kozlowski, Erica Hollar, Sydney Givens, and Bill Mavrakis ("Mavrakis") were working at Sands Jewelry Company in Richmond Heights, Ohio. At approximately 4:19 p.m., two masked men entered the store with guns. Video footage of the incident was captured by the store's surveillance cameras.

{¶ 7} Erica Hollar testified that she was working in the store's main showroom at the time of the incident. Hollar stated that when the masked men walked inside the store, she noticed that each man had a gun. Hollar described the first man as "a thin-build black man with a mask on, dark clothes." She testified that the second masked man was wearing "a very similar ensemble" and was approximately the same height as the first man. Hollar estimated that the men were "young adults."

{¶ 8} Hollar testified that when she encountered the masked men, she "froze because they were saying, Don't move." Hollar stated that one of the men then pointed his gun at her and ordered her to get on the ground. Hollar testified that she was terrified and stayed on the ground and faced the wall until her boss, Susan Kozlowski, told her to run out of the store. Hollar did not observe anything while she was facing the wall, but heard one of the individuals tell Mrs. Kozlowski "you have to give us something or we're going to shoot somebody."

{¶ 9} Mrs. Kozlowski is the co-owner of the jewelry store. She testified that at approximately 4:19 p.m. on May 22, 2017, she was working in the jewelry store when she heard a commotion and saw her husband, Steven Kozlowski, running towards the back of the building. Mrs. Kozlowski testified that when she realized the store was being robbed, she confronted one of the masked men and yelled at him to get out of her store. As the robbery was occurring, Mrs. Kozlowski observed Hollar "on her knees with her hands over her head to protect herself." Mrs. Kozlowski also observed another store employee, Sydney Givens, hiding under a table. When one of the masked men pointed his gun at the back of Hollar's head, Mrs. Kozlowski attempted to persuade him that it was "not worth killing somebody over this." The masked man responded, "I'm going to get me some." Despite this threat, Mrs. Kozlowski boldly told the masked man that they "aren't going to get a thing." Ultimately, the masked men fled the scene without taking any of the store's property.

{¶ 10} Mrs. Kozlowski testified that the masked men were African-American. She further stated that "they were just wearing dark, head to toe, and something over their faces." Mrs. Kozlowski testified that the gun she observed pointed at Hollar was "a silver color." However, Mrs. Kozlowski admitted that she was not wearing her eyeglasses at the time of the robbery and, therefore, was not able to see the two men clearly.

{¶ 11} Steven Kozlowski testified that on the day of the incident, he was working in the front main showroom of the store with Hollar and Givens. Mr. Kozlowski testified that he began to walk towards the back of the store to speak with Mrs. Kozlowski when he was suddenly confronted by a masked man holding a gun. Mr. Kozlowski testified that he saw two masked men in the store and that both men were in possession of a gun. One of the masked men pointed a gun directly at Mr. Kozlowski and stated, "Don't move, don't move." Despite the masked man's directives, however, Mr. Kozlowki ran down the hallway towards the back of the building. Once inside a secure location, Mr. Kozlowski called 911. The 911 call was played during trial.

{¶ 12} While standing by the backdoor of the store, Mr. Kozlowski noticed a suspicious car that was parked near the back of the property that "certainly didn't belong there." Mr. Kozlowski suspected the car was the "get-away car" and had store employee, Bill Mavrakis, take photographs of the car and its license plate.

While this was occurring, Mr. Kozlowski suddenly observed "the two guys walk right by us fairly slowly, masks are off." Mr. Kozlowski clarified that his statement regarding "the two guys" referred to "the two guys that were in the store with the guns." Mr. Kozlowski explained that he was able to identify the men as the masked robbers because "they had masks and they were dressed exactly the same." Mr. Kozlowski noted their dark clothing, their gloves, and the stripe on one of the men's pants. Mr. Kozlowski further stated that he could see that the men still had their masks and that they attempted to "try to make a move to put [their] masks back up" once they noticed Mr. Kozlowski and Mavrakis. Mr. Kozlowski testified that he was able to get a good look at one of the individuals, whom he identified in court as being Morris. In addition, Mr. Kozlowski expressed that he was confident Morris was the individual who pointed a gun at him inside the jewelry store because the perpetrator's face was only covered from his nose down, and Morris has "very distinctive eyes."

{¶ 13} When the two men "started to run" from the scene, Mavrakis immediately began chasing them on foot. At that point, Mr. Kozlowski got into his own vehicle and followed the two men as they ran. Mr. Kozlowski testified that he observed the men get into a "gold colored car" that was driven by a third individual. Mr. Kozlowski stated that he provided the 911 dispatcher the license plate number of the gold car and proceeded to follow the gold car through the streets of Cleveland until he was ordered by the police to stand down.

{¶ 14} Mavrakis testified that he was working as an independent contractor at the jewelry store on May 22, 2017. During the robbery, Mavrakis was located in the rear repair shop of the store with Mrs. Kozlowski. Mavrakis testified that he and Mrs. Kozlowski "heard a noise" and saw Mr. Kozlowski "running down the hallway, which was very odd." When they went to the nearby hallway to investigate, Mavrakis observed a masked man with a gun. Mavrakis testified that while Mrs. Kozlowski was confronting a masked man, Mr. Kozlowski grabbed him, took him outside, and stated, "We're being robbed." Once outside, Mavrakis took photographs of a suspicious vehicle. Shortly thereafter, Mavrakis observed a man walking near the back of the property. Mavrakis testified that he "assumed" that the man he observed walking was the masked gunman he previously observed in the store. Mavrakis testified that the man was not wearing the mask over his face at that time. However, when the man noticed Mavrakis, "he pulled a mask back onto his head." Mavrakis stated that the man "was struggling to pull it (the mask) on because he still had the gun in his hand." Mavrakis stated that a second individual joined the walking man several seconds later. Once the men noticed Mavrakis, "they both ran." Mavrakis attempted to chase after them but quickly "lost track of them."

{¶ 15} Detective Charles Duffy of the City of Richmond Heights Police Department, testified that he was assigned to investigate the jewelry store robbery. In the course of his investigation, Det. Duffy used the license plate number provided by Mr. Kozlowski to determine that the gold car was registered to Lamar Carr.

4

Upon contacting Carr, Det. Duffy learned that either Carr's parents or brother, codefendant Denzel Carr, were in possession of the car on the day of the robbery. Det. Duffy testified that Lamar Carr provided him with Denzel's cellphone number. In turn, Det. Duffy contacted Denzel's cell-phone provider and "sent an exigent circumstance request for immediate pings and traces on that cell phone." Shortly thereafter, the cell-phone provider sent Det. Duffy "longitude and latitude pings from [Denzel's] cell phone" which led to the recovery of the unoccupied vehicle in Cleveland, Ohio.

{¶ 16} Denzel was eventually brought into the police station by his father. Det. Duffy testified that Denzel provided an alibi and indicated that he had previously reported the vehicle as stolen. However, after Denzel was released, Det. Duffy investigated Denzel's alibi and determined that his statements were false. Accordingly, Det. Duffy issued a warrant for Denzel's arrest.

{¶ 17} When Denzel was arrested several days later, he provided a second written statement to Det. Duffy, implicating Rai'Shoun Morris and Morris as the two men who robbed the jewelry store. Following Denzel's arrest, Det. Duffy obtained a search warrant to conduct a forensic examination of Denzel's cell phone. In addition, Det. Duffy used information provided by Denzel to locate a cell phone behind Denzel's home that was "believed to be [Morris's] phone." Det. Duffy testified that he also obtained a warrant to have Morris's cell phone manually searched.

{¶ 18} At that point, Det. Duffy was able to see the text message and call records from Denzel and Morris's personal cell phones. Det. Duffy testified that the phone records corroborated Denzel's statement that he had conversations with Morris leading up to the robbery. Relevant to this appeal, the following text messages were exchanged between Denzel and Morris:

> DENZEL: gotchu [May 21, 2017 at 10:49 a.m.]
> MORRIS: Ima bless you. You tryna drive me to hit this lick on Monday? [May 21, 2017 at 10:49 a.m.]
> DENZEL: Lee Road. Where the play at? [May 22, 2017 at 11:06 a.m.]
> MORRIS: In Richmond it's for the bands too. [May 22, 2017 at 11:22 a.m.]
> DENZEL: Wya [May 22, 2017 at 1:25 p.m.]
> MORRIS: My bad I was on the toilet lol here I come. [May 22, 2017 at 1:25 p.m.]
> DENZEL: lol bet [May 22, 2017 at 1:25 p.m.]

{¶ 19} Det. Duffy testified that the term "bands" refers to a large amount of money. He further testified that the terms "play" or "lick" refer to criminal activity, and that Denzel's use of the term "bet" meant he and Morris had a deal.

5

{¶ 20} Det. Duffy also testified about a series of text messages sent between Morris and an individual listed as "Lil Bit." In a text message sent at 4:11 p.m. on May 22, 2017, Lil Bit asked Morris "where's my gun at?" Just before the robbery occurred, Morris responded, "I'm on my way. Where you at[?]" and "It took a minute." Morris also received a text message on May 19, 2017, from a person listed as "Momma Digga" asking "you got my gun rico [sic]?" In addition, the phone records reflect that after the robbery occurred, Denzel received a text message on May 22, 2017, at 5:02 p.m. from Rai'Shoun's cell phone that stated, "Call me this Ricco." At 5:03 p.m., Denzel called Rai'Shoun's cell phone.

{¶ 21} Det. Duffy then provided extensive testimony concerning the information he gathered from the data obtained from his exigent circumstances request. Using cell-phone tower pings from Denzel's cell phone, Det. Duffy was able to construct a map of his travel on May 22, 2017. In summary, Det. Duffy testified that during a time period immediately following the robbery, the cell phone ping data indicated that Denzel's phone traveled from Richmond Heights westbound towards Cleveland in the direction of where Denzel said he dropped off [Morris] and his brother. And then from there they headed in an easterly direction towards Warrensville Heights to where [Denzel's] vehicle was recovered."

{¶ 22} In the course of his investigation, Det. Duffy also obtained and reviewed surveillance footage taken from inside the jewelry store during the robbery. A still photograph of one of the masked men was generated from the video footage. Det. Duffy testified that he was able to identify Morris as the masked man based on Morris's distinct eyes, forehead, and hairline.

{¶ 23} Following his investigation, Det. Duffy obtained warrants for the arrest of Morris and his brother, Rai'Shoun. When Rai'Shoun was brought into the police station, he denied having any involvement in the robbery. At trial, Rai'Shoun testified that on the day of the robbery, he left his home to go to a local convenient store. When he came home, he discovered Morris in his bedroom "around five o'clock." Morris had a gun in his hand and asked Rai'Shoun to "hold" the gun for him. Rai'Shoun testified that Morris was upset and agitated, but would not tell Rai'Shoun what was wrong. Morris then asked to borrow Rai'Shoun's cell phone. Rai'Shoun testified that he believed Morris texted Denzel, but that Morris deleted the text message before giving Rai'Shoun his phone back. In addition, Rai'Shoun heard Morris talking on the phone with "somebody." When presented with phone records, Rai'Shoun testified that he did not place any outgoing calls while Morris was in his home.

{¶ 24} During his direct examination, Rai'Shoun admitted that he previously made statements to the police that implicated Morris in the robbery. For instance, he conceded that he told the police "they told me what they did, and after, I kicked both of them out." However, Rai'Shoun testified that when he spoke with the police, he was "nervous and just wanted to get out of the situation that [he] was in."

6

Rai'Shoun denied having any involvement in the robbery and insinuated that the statements he made to the police that were used to implicate Morris were lies.

{¶ 25} Denzel testified on behalf of the state. Denzel testified that he pleaded guilty to offenses for his involvement as the getaway driver of this robbery. However, throughout his direct examination, Denzel denied having any knowledge of the robbery and alleged that his statement to Det. Duffy was the product of coercion.

{¶ 26} With that said, Denzel admitted that on May 22, 2017, he picked up Morris and Rai'Shoun in his vehicle and drove them to the area where the jewelry store is located. He stated that Morris and Rai'Shoun then got out of his car. According to Denzel, he did not know what Morris and Rai'Shoun were planning to do when they left his car. However, he admitted that he "sort of had an idea" and believed it "was going to be a drug deal." When Morris and Rai'Shoun finally returned to his car, they were being followed by a truck. Denzel testified that the truck followed them until he managed to lose the truck on the freeway. After Denzel dropped Morris and Rai'Shoun off, Denzel noticed that someone had left a cell phone in his car. Denzel stated that he threw the cell phone in the back yard of his house "just in case."

{¶ 27} Morris testified on his own behalf. At all times, Morris has denied participating in the robbery of the jewelry store. However, Morris admitted that he was with Denzel on May 22, 2017. Regarding their text message conversations, Morris stated that he and Denzel orchestrated a plan to burglarize the home of a local drug dealer. Morris testified that the plan stalled when he told Denzel that he did not want to rob the drug dealer at gunpoint. Although Morris admitted that he had a gun in his possession that day, he testified that it was not in his nature to rob someone at gunpoint. According to Morris, Denzel became very upset when he refused to participate in the armed robbery. He stated that he got out of Denzel's car to avoid a confrontation, but accidently left his cell phone inside Denzel's car. Morris testified that he later used his brother's cell phone to call Denzel in the attempt to retrieve his phone from Denzel. Morris testified that he was not in Richmond Heights on the day of the jewelry store robbery and that Denzel never returned his cell phone.

{¶ 28} At the conclusion of trial, the court found Morris guilty of all counts and accompanying firearm specifications. He was sentenced to an aggregate 12-year prison term.

*State v. Morris*, 2019-Ohio-3184, 2019 WL 3764588, *1-*5, (Ohio Ct. App. Aug. 8, 2019).

**B.**    **State Court Trial**

Mr. Morris was indicted during the May 2017 term of the Cuyahoga County Court of

Common Pleas on a 14-count indictment including: one count of aggravated robbery in violation

of Ohio Rev. Code § 2911.01(A)(1), (Count 1); one count of robbery in violation of Ohio Rev.

Code § 2911.02(A)(1), (Count 2); four counts of robbery in violation of Ohio Rev. Code

§ 2911.02(A)(2), (Counts 3-6); four counts of robbery in violation of Ohio Rev. Code

§ 2911.02(A)(3), (Counts 7-10); and four counts of kidnapping in violation of R.C.

§ 2905.01(A)(2), (Counts 11-14).  (ECF Doc. 9-1, pp. 3-16.)  Each of the fourteen counts carried

1-year and 3-year firearm specifications. (*Id.*).

     Mr. Morris entered a plea of not guilty to all the charges in the indictment.  (*Id.* at p. 17.)

Mr. Morris later entered into plea negotiations with the State and withdrew his plea of not guilty

and agreed to plead guilty to Count 11 with a firearm specification of three years.  (*Id.* at p. 18.)

The trial court accepted Mr. Morris' guilty plea and amended Counts 1 and 11 to include all

victims listed in the indictment, deleted the one-year firearm specification on each of Counts 1

and 11, and nolled all remaining counts of the indictment.  (*Id.*)

     During his sentencing hearing, Mr. Morris moved to withdraw his guilty plea and

proceed with trial.  (ECF Doc. 10-1, p. 23.)  The state court then conducted a hearing on the

motion to withdraw Mr. Morris' plea, granted the motion and set a trial date on the original

indictment.  (*Id.* at pp. 24-31.)  Mr. Morris waived his right to a jury trial and elected to proceed

via bench trial.  (*Id.* at pp. 35-36.)

     The court found Mr. Morris guilty on all counts and specifications in the indictment.

(ECF Doc. 9-1, p. 20.)  Counts 1, 2, 11, 12, 13 and 14 were merged for sentencing, with the State

electing to sentence on Count 1; Counts 3 and 7 were merged, with the State electing to sentence

on Count 3; Counts 4 and 8 were merged, with the State electing to sentence on Count 4; Counts

5 and 9 were merged, with the State electing to sentence on Count 5; and Counts 6 and 10 were

merged, with the State electing to sentence on Count 6.  (*Id.* at p. 21.)  The trial court imposed a

sentence of: six years' incarceration on Count 1, with three years for the gun specification; five

years on Count 3, with three years for the gun specification; five years on Count 4, with three

years for the gun specification; five years on Count 5, with three years for the gun specification;

and five years on Count 6, with three years for the gun specification.  (*Id.* at 21-22.)  The court

ordered Counts 1, 3, 4, 5 and 6 served concurrently; with the gun specifications on Counts 1 and

3 served consecutively to each other and prior to the underlying offenses; and ordered the

remaining gun specifications served concurrently for a total sentence of twelve years'

incarceration.  (*Id.*)

**C.**     **Direct Appeal**

Mr. Morris filed a direct appeal to the Ohio Eighth District Court of Appeals.  (*Id.* at pp.

23-67.)  He raised three assignments of error:

1.      The trial court was without jurisdiction to conduct a bench trial because the
requirements of R.C. §2945.05 were not strictly followed;

2.      Insufficient evidence supported Appellant's conviction; and

3.      Appellant's conviction is against the manifest weight of the evidence.

(*Id.* at p. 38.)

On August 8, 2019, the court of appeals overruled his three assignments of error.  *Morris*,

2019 WL 3764588 at *5-*11.  The court found he had knowingly, intelligently, and voluntarily

waived his right to a jury trial in writing, and that his convictions were supported by sufficient

evidence and not against the manifest weight of the evidence.  *Id.* at *7, *11.

**D.**     **Postconviction Relief**

On January 27, 2020, Mr. Morris, *pro se,* filed a petition to vacate or set aside judgment

of conviction or sentence pursuant to Ohio Rev. Code § 2953.21 in the Cuyahoga County Court

of Common Pleas.  (ECF Doc. 9-1 at pp. 94; 96-112.)  He also requested appointment of counsel

in the matter.  (*Id.* at p. 95.)  In his petition, Mr. Morris raised the following claims for relief:

1. **Affidavits in Support of Petition.**  Supporting Facts: Co Defendant Denzel Carr admits in affidavit to never driving Del Ricco to Richmond Hts the day of the robbery.  The prosecution relied heavily on Denzel's testimony in trial to place Del Ricco in Richmond Hts the day of the robbery.  (*Id.* at p. 96.)

2. **Cruel and Unusual Punishment.**  Supporting Facts: Petitioner was detained at Cuyahoga County Jail from November 2017 to August 2018, while being booked into the jail Del Ricco told Cuyahoga County staff of his mental health issues and requested treatment.  The jail prescribed medicine which caused an allergic reaction after going to medical Del Ricco was took off meds and never gave any mental health treatment and/or counseling. Petitioner Del Ricco Morris also suffered inhuman conditions in Cuyahoga County Jail.  Petitioner is diagnosed with A.D.H.D. and Depression and could have not been competent if no mental health treatment was given for over 180 days while being subject to inhuman conditions in the Cuyahoga County Jail.  (*Id.* at p. 100.)

3. **Defendant Right, Right to Due Process.**  Supporting Facts: Prosecution did deliberately mislead the judge by creating false impression from the evidence, such conduct violates ethical rules and is unfairly prejudice.  The prosecution used text messages between co-defendant Denzel and Petitioner Del Ricco planning a burglary to mislead the judge into believing they were planning to rob a jewelry store.  (*Id.* at p. 104.)

4. **Ineffective Assistance of Counsel.**  Supporting Facts: Trial counsel did not conduct a reasonable investigation to determine a possible defense, due to trial attorney Michael Cheselka lack of investigation he was unable to cross-exam state witness Steven Kozlowski during trial because he had no knowledge of his prior statement.  Petitioner was denied his right to a fair trial and also denied a right to effective assistance of counsel.  (*Id.* at p. 107.)

5. **Brady Materials, Duty of Disclosure.**  Supporting Facts: Prosecution failed to disclose text messages between Petitioner Del Ricco Morris and Co-Defendant Denzel Carr planning a burglary.  Prosecution disclosed text messages from Petitioner Del Ricco to Co-Defendant Denzel planning a "lick" but failed to disclose text message from the same conversation showing that a burglary was being planned and not aggravated robbery.  This being favorable to defense violates Brady Material and therefore violative of due process.  (*Id.* at p. 109.)

On January 28, 2020, the state court denied Mr. Morris's post-conviction petition,

and denied his motion for appointment of counsel. (*Id.* at p. 113; *State v. Morris*, Case

No. CR-17-617940-B (Jan. 28, 2020).)  Mr. Morris did not appeal his case thereafter.

## II.     Federal Habeas Corpus Petition

Mr. Morris raises the following three Grounds for relief in this court:

> **GROUND ONE:** Ineffective Assistance of Counsel
>
> Supporting Facts: Counsel Michel Cheselka did not cross exam[ine] state witness Steven Kozlowski who made a[n] in-court identification during trial in which the state conviction relied on. Steven Kozlowski testimony did not corroborate with his original statement, counsel's failure to cross exam[ine] Steven Kozlowski during trial caused prejudice and [a]ffect[ed] the outcome.
>
> **GROUND TWO:** Insufficient Evidence Supported Appellant's Conviction
> Supporting Facts: Steven Kozlowski testimony did not corroborate with his original statement. Co-defendant Rai Shoun Morris testified the police told him the only way to help himself was to blame his brother (Appellant). Co-Defendant Denzel Carr testified his original statement was coerced by Detective Duffy. Denzel also stated in a affidavit Detective Duffy told him if he didn't place blame on someone he would serve 15 years while arrested at Richmond Hts Police Department.
>
> **GROUND THREE:** Petitioner['s] convictions are against the manifest weight of the evidence
> Supporting Facts: Witness Steven Kozlowski stated in his original statement that he saw the two suspects who robbed his store get into a gold Buick car and he followed them to the freeway. Evidence proves that while co[-]defendant Denzel Carr was on the freeway petitioner Morris was not in his car.

(ECF Doc. 1, pp. 5, 7-8.)

## III.     Motion for Stay and Abeyance or Dismissal of Grounds Two and Three

In response to Respondent's argument that Grounds Two and Three have not been exhausted (ECF Doc. 9, pp. 19-20), Mr. Morris requests a "stay-and-abeyance" of the current proceedings (ECF Doc. 12). In support of a stay, he says he raised Ground One in a state post-conviction petition but not Grounds Two or Three, and that he filed a mixed petition in this Court because he did not receive a copy of the decision on the post-conviction petition. (*Id.*) In the alternative, Mr. Morris asks that he be allowed to "delete" Grounds Two and Three from the

Petition and proceed with the claim in Count One only. (*Id.*) In support, he argues that dismissal of the entire Petition would unreasonably impair his right to obtain federal relief. (*Id.*)

Respondent opposes the motion for a stay but does not object to Mr. Morris' alternate request to dismiss Grounds Two and Three and proceed on Ground One alone. (ECF Doc. 13, pp. 1-3.) As to the motion for a stay, Respondent argues that a failure to receive Cuyahoga County records does not establish good cause for a failure to exhaust the claims in Grounds Two and Three, and that both grounds are plainly meritless. (*Id.* at pp. 2-3.)

A state prisoner with federal constitutional claims must fairly present them in state court before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b)(1)(A); *see O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). Even where a federal habeas petitioner presents a "mixed petition" containing both exhausted and unexhausted claims, comity requires that state courts be given the first opportunity to review the unexhausted claims. *See Rose v. Lundy*, 455 U.S. 509, 518-19 (1982). This Court may therefore deny a petition containing unexhausted claims in its entirety, but may not grant habeas relief if a petitioner still has state remedies available for any claims. *See* 28 U.S.C. § 2254(b)(1)(A); *Manning v. Macauley,* No. 20-1567, 2020 WL 7346021, at *2 (6th Cir. October 14, 2020).

Mr. Morris has not exhausted Grounds Two and Three of his Petition because he raised those claims in his direct appeal to the Ohio Eighth District Court of Appeals and may still seek a delayed discretionary appeal to the Ohio Supreme Court. (ECF Doc. 9-1, pp. 23-67). *See* Ohio S.Ct.Prac.R. 7.01(A)(4)(a). He does not have the same recourse for Ground One because he did not raise that claim in his direct appeal. While there is an argument that Mr. Morris raised Ground One in his state post-conviction petition, the Ohio Supreme Court does not permit

delayed appeals as to claims for postconviction relief.  *See* Ohio S.Ct.Prac.R. 7.01(A)(4)(c).  The Petition is therefore a "mixed petition" as contemplated in *Rose v. Lundy*.

If a mixed petition is dismissed while a petitioner pursues unexhausted claims in state court, there is a concern that any exhausted claims in the petition will become time-barred under the applicable one-year statute of limitations.  The U.S. Supreme Court therefore held in *Rhines v. Weber*, 544 U.S. 269 (2005), that a district court with a "mixed petition" may stay the case so the petitioner may present his unexhausted claims to the state court before the federal court reviews the petition.  *See Rhines*, 544 U.S. at 277.  A "stay and abeyance" is available where: (1) there was good cause for the petitioner's failure to exhaust the claims in state court; (2) the unexhausted claims are not plainly meritless; and (3) the petitioner has not engaged in abusive litigation tactics or intentional delay.  *See id.*  The process is used sparingly because frequent use could undermine the goals of "'reduc[ing] delays in the execution of state and federal criminal sentences'" and streamlining federal habeas proceedings by encouraging petitioners to seek relief first from state courts.  *Id.* at 276-77 (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).

Mr. Morris argues that good cause supports a stay and abeyance here because he "did not receive a copy of the court[']s decision on the Post Conviction Petition from Cuyahoga County Courts via U.S. mail" (ECF Doc. 12, p. 2), referring to the state court ruling on his petition to vacate or set aside judgment of conviction or sentence (ECF Doc. 9-1, pp. 96-112).  Although the U.S. Supreme Court held that a "petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file" a federal habeas petition containing unexhausted claims, *Pace v. DiGuglielmo,* 544 U.S. 408, 416 (2005), that precedent is not applicable here because Mr. Morris did not assert the claims underlying Grounds Two and Three in the postconviction petition he references.  Instead, he asserted those claims in his direct

appeal to the Ohio Eighth District Court of Appeals.  (ECF Doc. 9-1, pp. 23-67.)  He has offered

no explanation for his failure to exhaust his remedies on those claims through an appeal to the

Ohio Supreme Court.  Thus, he has failed to show "good cause" to support a stay and abeyance

while he exhausts the claims in Grounds Two and Three in state court.  *See Rhines*, 544 U.S. at

277.  The undersigned accordingly finds stay and abeyance is not an appropriate remedy here.

Even where a stay is not warranted, however, the U.S. Supreme Court has recognized that

the total exhaustion requirement is not intended to impair a petitioner's right to relief, stating:

> [I]f a petitioner presents a district court with a mixed petition and the court
> determines that stay and abeyance is inappropriate, the court should allow the
> petitioner to delete the unexhausted claims and to proceed with the exhausted
> claims if dismissal of the entire petition would unreasonably impair the petitioner's
> right to obtain federal relief.

*Rhines*, 544 U.S. at 278.  In his motion, Mr. Morris stated:

> [I]f stay-and-abeyance is inappropriate, Petitioner respectfully moves this court to
> allow the petitioner to delete the unexhausted claims Ground Two and Three and
> proceed with the exhausted claim Ground One, dismissal of the entire petition
> would unreasonable [*sic*] impair the petitioner's right to obtain federal relief.

(ECF Doc. 12, p. 2.)  Respondent does not oppose the request to dismiss Grounds Two and

Three and proceed on Ground One alone.  (ECF Doc. 13, p. 3.)

For the foregoing reasons, the undersigned recommends that the Court **DENY** Mr.

Morris' motion for stay and abeyance of this action while he returns to state court to exhaust his

remedies as to Grounds Two and Three of the Petition, but **GRANT** his alternate request to

dismiss Grounds Two and Three without prejudice so he may proceed on Ground One alone.

## IV.    Federal Habeas Corpus Petition – Ground One

In Ground One of the Petition, Mr. Morris asserts that he is entitled to federal habeas

corpus relief based on ineffective assistance of trial counsel, arguing:

> Counsel Michel Cheselka did not cross exam[ine] state witness Steven Kozlowski
> who made a[n] in-court identification during trial in which the state conviction

14

> relied on. Steven Kozlowski testimony did not corroborate with his original statement, counsel's failure to cross exam[ine] Steven Kozlowski during trial caused prejudice and [a]ffect[ed] the outcome.

(ECF Doc. 1, p. 5.)  For the reasons set forth in further detail below, the undersigned finds dismissal of the Petition is warranted because the claim in Ground One has been procedurally defaulted, and recommends that the Court **DISMISS** the Petition with prejudice.

## A.      Standard of Review Under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA.  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  First, courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances may not grant habeas relief "unless . . . the applicant has exhausted state remedies."  *Cullen*, 563 U.S. at 181 (citing 28 U.S.C. §§ 2254(a), (b), (c)). Second, if an application involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted unless the adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).  The burden of proof rests with the petitioner.  *See Cullen*, 563 U.S. at 181.

15

**B.      Whether Claim in Ground One Was Procedurally Defaulted**

In Ground One, Mr. Morris asserts that he was denied effective assistance of trial counsel when his attorney failed to cross-examine a witness who made an in-court identification upon which the state conviction relied.  (ECF Doc. 1, p. 5.)   He did not raise this argument on direct appeal.  (*Id.* at p. 6, *see also* ECF Doc. 9-1, p. 38.)  He did raise a related but distinct claim for ineffective assistance of trial counsel in his postconviction petition, which the Cuyahoga County Court of Common Pleas summarily denied on January 28, 2020.  (ECF Doc. 9-1, pp. 107, 113.) Mr. Morris did not appeal that denial to the Eighth District Court of Appeals.

Respondent argues that the claim in Ground One is procedurally defaulted because Mr. Morris did not fairly present that claim in state court, and further argues that Mr. Morris has failed to show that the default should be excused due to cause and prejudice or a miscarriage of justice.  (ECF Doc. 9, pp. 14, 16-19.)  Mr. Morris responds to Respondent's procedural default argument by arguing that his appellate counsel was also ineffective because she failed to raise ineffective assistance of trial counsel in Mr. Morris' direct appeal.  (*See* ECF Doc. 11, p. 1.)

**1.      Legal Standard for Procedural Default**

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  *See* 28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  *See* 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  To satisfy the fair presentation requirement, a habeas petitioner must present both the facts and legal theories

underpinning his claims to the state courts.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law.  *See, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004); *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987).  A constitutional claim for relief must also be presented to the state's highest court to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

A petitioner must also meet certain procedural requirements to have his claims reviewed in federal court.  *See Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as . . . rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies where state remedies are "still available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, where state court remedies are no longer available, procedural default applies rather than exhaustion.  *See Williams*, 460 F.3d at 806.

Procedural default may occur in two ways.  First, a petitioner may procedurally default a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."  *Id.*  Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'"  *Id.* (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state

courts] cannot be considered in a federal habeas corpus petition."); *State v. Moreland*, 552 N.E. 2d 894, 899 (Ohio 1990) (finding failure to present a claim to a state court of appeals constituted a waiver).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.  Thus, even if the exhaustion requirement is technically satisfied because no state remedies remain available to the petitioner, the petitioner's prior failure to present those claims for consideration in state court may cause a procedural default that bars federal court review of the claims.  *See Williams,* 460 F.3d at 806 (citing *Coleman v. Thompson,* 501 U.S. 722, 732 (1991)).

To overcome procedural default, a petitioner must: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750.  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

### 2.    Whether the Claim in Ground One Was Fairly Presented in State Court and Pursued Through Ordinary Appellate Procedures

Respondent argues that Ground One is procedurally defaulted because that claim was not fairly presented to the state courts.  (ECF Doc. 9, pp. 14-16.)  Specifically, Respondent contends: "to fairly present this issue, it should have been raised as a federal constitutional violation in the direct appeal" and "fairly presented for one complete round of appeals at every stage of the state's appellate process."  (*Id*. at pp. 14-15.)   Mr. Morris does not dispute Respondent's fair presentation argument, arguing instead that his procedural default should be excused based on "cause and prejudice."  (ECF Doc. 11, p. 1.)

18

There is no dispute that Mr. Morris failed to assert the ineffective assistance of counsel claim from Ground One in his direct appeal to the Eighth District Court of Appeals.  (ECF Doc. 9-1, pp. 23-67.)  To the extent the claim in Ground One was apparent from the face of the trial record, Mr. Morris' failure to raise it on direct appeal would cause a procedural default under Ohio's doctrine of *res judicata*.  *See Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

There are limited circumstances where a prisoner seeking postconviction relief in Ohio may avoid a *res judicata* bar for a claim that was not raised on direct appeal, including where claims involve evidence outside the trial record.  *See State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982) ("Generally, the introduction in an R.C. 2953.21 petition of evidence *dehors* the record of ineffective assistance of counsel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of *res judicata*.").  Here, Mr. Morris filed a postconviction petition arguing that his trial counsel failed to investigate his case fully and was thus unprepared to cross-examine the witness whose testimony is challenged in Ground One.  (ECF Doc. 9-1, pp. 107-08.)  In support, he provided evidence outside the record in the form of his own affidavit, which stated:

> During my trial I was responsible for preparing notes and questions for my attorney Michael Chelselka to use during trial . . . I feel my trial attorney Michael Chelselka never had my best interest based on the lack of knowledge he had about my case, and the fact every question he asked during trial was wr[itten] by me.  Good or bad faith my trial attorney Michael Chelselka never conducted a reasonable investigation to ensure me a right to a fair trial and effective counsel which did [a]ffect the outcome.

(*Id.* at p. 108.)

Even assuming Mr. Morris' affidavit provides evidence outside the record allowing him to avoid a *res judicata* bar, Respondent correctly points out that the claim asserted by Mr. Morris in his state postconviction proceeding is not the same claim raised in Ground One.  (ECF Doc. 9, p. 15.)  A federal claim for relief is only "fairly presented" when it was presented to the state

19

court under the same constitutional theory as the later federal claim, including the same legal and factual basis. *See Williams*, 460 F.3d at 806. Here, Mr. Morris' state postconviction petition asserted ineffective assistance of counsel based on his trial attorney's failure to *investigate*, which allegedly caused him to be "unable to cross-exam state witness Steven Kozlowski during trial because he had no knowledge of his prior statement." (ECF Doc. 9-1, p. 107.) In Ground One of this Petition, in contrast, Mr. Morris asserted ineffective assistance of counsel based on his trial attorney's failure to *cross-examine* the same witness regarding the fact that his "testimony did not corroborate with his original statement." (ECF Doc. 1, p. 5.) While there are parallels between the claims, they do not present an identical constitutional theory or facts.

Ultimately, the Court need not determine whether Mr. Morris' failure to assert the claim in Ground One on direct appeal caused a procedural default, or whether the ineffective assistance of counsel claim asserted in Ground One was "fairly presented" in the parallel but distinct ineffective assistance of counsel claim in his state postconviction petition. Even if the ineffective assistance of counsel claim in the state postconviction petition "fairly presented" the claim in Ground One, that claim was nevertheless procedurally defaulted because Mr. Morris did not appeal the denial of that state postconviction petition.

On federal habeas review, a district court cannot consider issues that were not presented at every level of the Ohio state court system. *See Baston*, 282 F.Supp.2d at 661. A petitioner must therefore fully pursue a claim "through the state's 'ordinary appellate review procedures'" or risk procedural default. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.

Mr. Morris did not present the federal claim in Ground One at every level of the Ohio state courts. Although he filed a direct appeal with the Eighth District Court of Appeals on January 16, 2019, he did not include an ineffective assistance of counsel claim.  (ECF Doc. 9-1, pp. 35-46.)  He later raised a related but distinct claim for ineffective assistance of counsel in a *pro se* postconviction petition filed on January 27 2020 (*id.* at p. 107), but did not appeal that denial to the Eighth District Court of Appeals or the Ohio Supreme Court.

An appeal of the state court's denial of his postconviction petition is no longer available under Ohio law.  *See Nichols*, 463 N.E.2d at 378 (finding a delayed appeal under App. R. 5(A) is not available in appeal of postconviction relief determination under Ohio Rev. Code § 2953.23(B)); Ohio S. Ct. Prac. R. 7.01(A)(4)(c) (stating delayed appeals are unavailable in cases involving postconviction relief).  Because Mr. Morris failed to fairly present the claim in Ground One at every level of the Ohio state courts and state law no longer allows him to pursue appellate review, the undersigned concludes that the claim in Ground One was procedurally defaulted.  *See Williams*, 460 F.3d at 806.  Accordingly, the undersigned must consider whether cause and prejudice or a fundamental miscarriage of justice serve to excuse the default.

### 3.    Whether Cause and Prejudice Excuse Procedural Default

In response to Respondent's procedural default arguments, Mr. Morris argues "his appellate counsel's failure to raise Ineffective Assistance of Counsel [on direct appeal] constitutes Ineffective Assistance of Appellate Counsel, thereby demonstrating cause and prejudice to excuse and [*sic*] procedural default."  (ECF Doc. 11, p. 1.)  He also requests a hearing to determine cause and prejudice, asserting: "[w]ithout a hearing petitioner would be denied an opportunity to meet the Supreme Court's cause and prejudice requirement."  (*Id.*)

To establish "cause" to excuse procedural default, a petitioner must point to "something external . . . that cannot be fairly attributed to him."  *Coleman*, 501 U.S. at 753.  Ordinarily, he

must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  As the U.S. Supreme Court explained:

> Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial. To the contrary, cause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim.

*Murray*, 477 U.S. at 492.  An attorney's "ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753 (quoting *Murray*, 477 U.S. at 488).

Mr. Morris argues in his Traverse that his appellate attorney's failure to assert the claim in Ground One on direct appeal constituted "Ineffective Assistance of Appellate Counsel, thereby demonstrating cause and prejudice" sufficient to excuse procedural default.  (ECF Doc. 11, p. 1.)  However, he does not specify what error or external circumstances caused the decision of his appellate attorney to rise to the level of ineffective assistance of counsel.  Indeed, his Petition only states: "Counsel Kelly Zacharias chose to not raise this issue in my direct appeal." (ECF Doc. 1, p. 6.)  Mr. Morris has therefore failed to sufficiently articulate and support his argument that "cause and prejudice" excuse the procedural default of Count One.

Further, a claim for ineffective assistance of appellate counsel may not be used to excuse procedural default where that claim is itself procedurally defaulted.  *See Landrum v. Mitchell*, 625 F.3d 905, 916 (6th Cir. 2010).  A defendant claiming ineffective assistance of appellate counsel in Ohio must apply to the Ohio Court of Appeals to reopen the direct appeal under Ohio App. R. 26(B).  *Id.*  Here, there is no evidence that Mr. Morris sought to reopen his direct appeal

22

under Rule 26(B), or otherwise presented a claim for ineffective assistance of appellate counsel in state court. Thus, even if Mr. Morris had sufficiently articulated and supported a claim that ineffective assistance by appellate counsel caused the procedural default of Ground One, this Court could not excuse the default because the claim supporting that excuse was raised for the first time in federal court and not properly exhausted.

For the reasons stated, the undersigned finds Mr. Morris has not met his burden to demonstrate "cause" to excuse the procedural default of Ground One. The undersigned also finds Mr. Morris has failed to show that a hearing on the issue of cause and prejudice is appropriate in this case. *See generally* 28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, 142 S.Ct. 1718, 1740 (2022) (finding "no warrant to impose any factfinding beyond § 2254(e)(2)'s narrow exceptions to AEDPA's 'genera[l] ba[r on] evidentiary hearings'" (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013)). The request for a hearing is DENIED.

### 4. Whether "Actual Innocence" Excuses Procedural Default

A procedural default may also be excused where a failure to consider a claim will result in a "fundamental miscarriage of justice." *See Coleman*, 501 U.S. at 750. "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren*, 440 F.3d at 764 (quoting *Murray*, 477 U.S. at 496). For an actual innocence claim to be credible, a petitioner must "support his allegations with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). He must further "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327. This standard is intended to permit petitioners with "truly extraordinary" cases a "meaningful avenue by which to avoid a manifest injustice." *Id.* (internal quotations

omitted).  Notably, "'actual innocence' means factual innocence, not mere legal insufficiency."

*Bousley v. United States*, 523 U.S. 614, 623 (1998).

Mr. Morris has presented no new evidence on which the undersigned can rely to demonstrate his actual innocence.  Neither has he argued actual innocence in his Traverse or elsewhere in the pleadings before this Court.  (*See* ECF Docs. 1, 11, 12.)  The undersigned accordingly determines no miscarriage of justice will occur if his claims are not considered.

For the reasons set forth above, the undersigned finds that the sole remaining claim in the Petition – Ground One – was procedurally defaulted, and Mr. Morris did not meet his burden to show "cause and prejudice" or a fundamental miscarriage of justice to excuse the default. Accordingly, the undersigned recommends that the Court **DISMISS** the Petition with prejudice.

## V.    Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that the Court: (1) **DENY** Mr. Morris' motion for stay and abeyance; (2) **GRANT** his alternate request to dismiss Grounds Two and Three without prejudice so he may proceed on Ground One alone; and (3) **DISMISS** the sole remaining claim in the Petition (Ground One) with prejudice on the basis of procedural default.

Dated: June 21, 2023

  */s/ Amanda M. Knapp*
  AMANDA M. KNAPP
  UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).